951 F.2d 364
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kathleen Rebecca KIBA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Stephen George KIBA, Defendant-Appellant.
 Nos. 91-50149, 91-50159.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 4, 1991
Decided Jan. 8, 1992.
 
 Before JAMES R. BROWNING, BOOCHEVER and REINHARDT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Kathleen Rebecca Kiba and Stephen George Kiba appeal their convictions and sentences for conspiracy to manufacture methamphetamine. We AFFIRM in part and REMAND in part.
 
 BACKGROUND
 
 3
 On October 30, 1989, the Drug Enforcement Administration (DEA) arranged a controlled buy of methamphetamine between an agent and co-defendant Richard Gold (aka Steven Anderson) in Pacific Beach, San Diego. When DEA agents proceeded to arrest him, Gold attempted to flee and to shoot an agent with a handgun. During the pursuit, DEA agents fired shots. Shortly thereafter, the news media arrived on the scene. DEA agents apprehended Gold and seized a loaded handgun and several pounds of methamphetamine. Concerned that the news media would broadcast the event, DEA agents went to Gold's house and conducted a search, based upon the consent of Michael Clapp, Gold's roommate. They seized approximately two pounds of methamphetamine, chemicals and equipment used in the manufacture of methamphetamine, and another firearm. During the search, co-defendant William Chambers arrived at Gold's house to deliver one pound of "wet" methamphetamine. After his arrest, Chambers confessed to his involvement and admitted that he had just come from the laboratory site, which was located at the residence of Stephen and Kathleen Kiba.
 
 
 4
 Clapp and Chambers directed agents to the Kiba residence at 3862 Tiara Street, San Diego. Chambers told the agents that people were at the residence when he left. When DEA agents arrived at the laboratory site, the house lights were on and the blinds were drawn. Agent Powers knocked on the back screen door and announced his presence but did not receive a response. In the back of the residence, he saw an activated fan, smelt odors associated with the manufacture of methamphetamine and saw some parts of the laboratory equipment. DEA agents entered the residence and conducted a protective sweep. They found a laboratory in the patio area but did not find anyone in the house. Thereafter, the agents obtained and executed a telephonic search warrant.
 
 
 5
 The search of the residence, the patio and the garage led to the seizure of chemicals and notes relating to the manufacture and distribution of methamphetamine. Agents found documents indicating dominion and control of the premises by Stephen and Kathleen Kiba, along with packets of methamphetamine. They also found a .38 caliber revolver, a .410 shotgun, and magazine clips and ammunition for an AK-47 assault rifle. Kathleen and Stephen Kiba were arrested on November 1, 1989 in Ocean Beach, San Diego. On September 7, 1990, a jury found the Kibas guilty of conspiracy to manufacture methamphetamine with intent to distribute. The district court sentenced both Kathleen and Stephen Kiba to 188 months imprisonment,[1] followed by five years supervised release.
 
 
 6
 Kathleen and Stephen Kiba seek reversal of their convictions, claiming the protective sweep of their Tiara Street residence was not justified by exigent circumstances. Kathleen Kiba also claims that the evidence was insufficient to support her conviction. In the alternative, they both appeal the district court's enhancement of their base offense level for firearm possession. In addition, Kathleen Kiba challenges the district court's denial of a reduction in her base offense level for acceptance of responsibility and its refusal to depart downward in imposing sentence.
 
 DISCUSSION
 I. Protective Sweep
 
 7
 We uphold the district court's findings of fact at a suppression hearing unless they are clearly erroneous. We review de novo the ultimate issue of whether exigent circumstances justify a warrantless entry and/or search. United States v. Echegoyen, 799 F.2d 1271, 1277-78 (9th Cir.1986). We have defined exigent circumstances
 
 
 8
 as those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.
 
 
 9
 United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984).
 
 
 10
 Our review of the record reveals ample evidence to justify the district court's finding of exigent circumstances. DEA agents were concerned about the arrival of the television news crew on the scene of Gold's arrest. The possible broadcast of the event could have alerted other potential defendants of police activity and would have frustrated DEA agents' efforts to apprehend other members of the conspiracy. United States v. Johnson, 660 F.2d 749, 752-53 (9th Cir.1981), cert. denied, 455 U.S. 912 (1982).
 
 
 11
 Furthermore, when DEA agents arrived at the Tiara Street residence, the lights inside the house were on and the blinds were drawn. Chambers had just left the Tiara Street residence to deliver one pound of methamphetamine. He had also informed DEA agents that when he had left, people were still in the house. Thus, it was reasonable for the agents to assume that the suspects in the house would be alarmed when Chambers did not return and would either destroy the evidence or would escape. United States v. Andersson, 813 F.2d 1450, 1455 (9th Cir.1987).
 
 
 12
 Finally, when Agent Powers knocked on the door of the Tiara Street residence, he could smell chemical odors associated with methamphetamine manufacturing and could see some of the equipment. Powers' experience as a narcotics officer led him to believe that the laboratory posed an explosive danger to the agents as well as to the residential neighborhood.
 
 
 13
 Therefore, faced with the potential of an explosion and the possible destruction of evidence or flight of suspects, the DEA agents could properly conclude that they did not have sufficient time to obtain even a telephonic search warrant. Stephen Kiba concedes that the time necessary to obtain a telephonic warrant is approximately 45 minutes. Thus, exigent circumstances existed because the totality of circumstances known to the DEA agents were such that a reasonable person could have believed that immediate entry was necessary to safeguard public safety and to preserve evidence.
 
 II. Sufficiency of Evidence
 
 14
 In reviewing the sufficiency of the evidence to support Kathleen Kiba's criminal conviction, we must determine whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found her guilty beyond a reasonable doubt of each essential element of conspiracy to manufacture methamphetamine. United States v. Hernandez, 876 F.2d 774, 777 (9th Cir.) cert. denied, 493 U.S. 863 (1989). Here, Clapp and Chambers both testified about the existence of the conspiracy between Gold and the Kibas to manufacture and distribute methamphetamine. Having proven that a narcotics conspiracy exists, evidence of only a slight connection is necessary to convict Kathleen Kiba of knowing participation in it. United States v. Cuevas, 847 F.2d 1417, 1422 (9th Cir.1988) cert. denied, 489 U.S. 1012 (1989).
 
 
 15
 The evidence in this case establishes a sufficient connection. Clapp testified that the Kibas came to his home in early October 1989 to manufacture methamphetamine with his roommate, Gold. He saw the Kibas move laboratory equipment into the garage. Clapp saw both Stephen and Kathleen Kiba, coming out of the garage, wearing gas masks and perspiring. He also overheard conversations between the Kibas and Gold regarding the manufacture of methamphetamine. Chambers also testified that he assisted the Kibas in the manufacture of methamphetamine at their house. While Stephen Kiba and Chambers manufactured the drug, Kathleen Kiba provided meals for them and on one occasion purchased twenty bags of ice which was used in the manufacturing process. Therefore, sufficient evidence supported Kathleen Kiba's conviction for participation in the conspiracy to manufacture methamphetamine.
 
 III. Sentencing Claims
 A. Enhancement for Firearm Possession
 
 16
 We review the district court's findings regarding firearm possession and acceptance of responsibility for one's crime for clear error. United States v. Garcia, 909 F.2d 1346, 1349 (9th Cir.1990); United States v. Gonzales, 897 F.2d 1018, 1019 (9th Cir.1990).
 
 
 17
 A sentencing court may increase the base offense level by two points if the defendant possessed a firearm during the unlawful manufacture of narcotics. United States Sentencing Commission, Guidelines Manual (U.S.S.G.) § 2D1.1(b)(1) (Nov. 1, 1988). Application Note 3 specifically states that the adjustment should be applied if the firearm was present unless it is clearly improbable that the firearm was connected with the offense. Here, the agents found a .38 caliber revolver and a .410 shotgun at the Kiba residence. One was found in the garage, and the other was found in a bedroom. The sentencing court found that the weapons were in plain sight and that their presence was known to Stephen and Kathleen Kiba. The Kibas were convicted of conspiracy to manufacture methamphetamine. For the firearm enhancement to apply, there must be a showing that the firearms were connected with the offense. There was no clear error in the district court's finding that the firearms, present at the laboratory site, were connected to the conspiracy to manufacture methamphetamine.[2] We, therefore, affirm the district court's enhancement of the Kibas' base offense level for possession of a firearm during the manufacture of methamphetamine.
 
 B. Acceptance of Responsibility
 
 18
 A sentencing court may reduce the base offense level by two levels if the defendant clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. U.S.S.G. § 3E1.1(a). We accord great deference to the determination by the sentencing court because of its unique position to evaluate a defendant's acceptance of responsibility. U.S.S.G. § 3E1.1, Application Note 5; see also Gonzales, 897 F.2d at 1019 (quoting U.S.S.G. § 3E1.1, Application Note 5). Kathleen Kiba has repeatedly denied that she was involved in or aware of the manufacture of methamphetamine. We find no error in the district court's denial of a downward adjustment for acceptance of responsibility.
 
 
 19
 C. Downward Departure for Youthful Lack of Guidance
 
 
 20
 Kathleen Kiba also argues that the district court should have granted her a downward departure in determining her sentence, in part because of psychological impairment arising from her chaotic and abusive childhood. While a district court's discretionary refusal to depart downward is not subject to review, United States v. Zweber, 913 F.2d 705, 707 (9th Cir.1990), a defendant may appeal a court's allegedly erroneous finding that it lacked authority to depart downward as a matter of law. See, e.g., United States v. Page, 922 F.2d 534, 535 (9th Cir.1991) (per curiam). Such a question involves the construction and interpretation of the Guidelines, which we review de novo. See United States v. Carvajal, 905 F.2d 1292, 1294 (9th Cir.1990).
 
 
 21
 Here, the record is unclear whether the district court merely declined to exercise its discretion to depart downward or whether the court believed it lacked the authority to depart downward as a matter of law based on Kiba's psychological impairment and troubled childhood. Cf. United States v. Dickey, 924 F.2d 836, 839 (9th Cir.) (finding an unclear record as to whether the district court did not depart downward as a matter or law or as a matter of discretion), cert. denied, 112 S.Ct. 383 (1991). Accordingly, we remand to the district court for clarification of its sentencing decision and such further action as may be appropriate, especially in view of our recent decision in United States v. Floyd, 945 F.2d 1096 (9th Cir.1991). In Floyd, we approved a district court's decision to depart downward in calculating a defendant's sentence, based upon the defendant's "lack of guidance and education, abandonment by the parents and imprisonment at age 17." Id. at 1099. Relying in part on U.S.S.G. § 1B1.4, which authorizes the sentencing court to consider any information concerning the background of the defendant unless otherwise prohibited by law, we held that a district court may consider such "youthful lack of guidance" in determining an appropriate sentence. Id. at 1101-02. If the district court declined to consider Kiba's request for a downward departure because it believed that it lacked the discretion to do so, it shall consider that request upon remand. We leave to its initial determination the procedures to be followed when doing so. On the other hand, if the district court denied Kiba's request on the merits, it shall simply enter an order clarifying its original decision. In any event, this panel shall retain jurisdiction over any further proceedings that may result from the district court's determinations on remand.
 
 CONCLUSION
 
 22
 We AFFIRM Stephen and Kathleen Kiba's convictions and also AFFIRM Stephen Kiba's sentence for conspiracy to manufacture methamphetamine. We REMAND to the district court for a clarification of its ruling on Kathleen Kiba's request for a downward departure based upon psychological impairment arising from a chaotic and abusive childhood, and for such further action as may be appropriate in light of United States v. Floyd, 945 F.2d 1096 (9th Cir.1991), and the determinations set forth in this disposition.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The district court applied the Sentencing Guidelines which were in effect on October 31, 1988
 
 
 [2]
 The district court did err in finding William Chambers had worn a weapon during the manufacturing process, but this error was harmless in light of the evidence of weapons in plain sight